UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> MARCO G. BABINI <br><br> Defendant | No. 15cr10261-PBS-JCB |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

Defendant Marco G. Babini, who has known about the indictment pending against him since 2015, vigorously contested extradition to the United States from his home country of Canada for over three years. He has no meaningful ties to the United States (much less this District), and he stands charged with serious and sophisticated fraud offenses that involved the use of nominee financial accounts in Europe. The government's case against him is strong, consisting in significant part of audio recordings of the defendant coordinating key aspects of the conspiracy and making critical admissions. And the potential punishment the defendant faces for his misconduct is significant. For these reasons, the defendant poses a serious risk of flight and no combination of conditions will reasonably assure the defendant's appearance at trial. Pursuant to factors set forth in 18 U.S.C. § 3142(g), the defendant should be detained.[1]

---

[1] At the time of this filing, the government has not yet received a copy of Probation's bail report. Assuming receipt prior to the detention hearing, the government will endeavor to be prepared to address during the hearing any facts and circumstances discussed in the report that are not otherwise addressed herein.

## BACKGROUND

A grand jury returned the pending indictment against the defendant in September 2015. (Dkt. #3.) The indictment alleges that the defendant, together with several others, engaged in a scheme to defraud investors in the publicly traded company Endeavor Power Corp. ("Endeavor"), which was based in Massachusetts. Specifically, between approximately July 2012 and March 2013, the defendant and others executed a scheme in which the defendant secretly controlled and accumulated a significant portion of the purportedly unrestricted shares of Endeavor without making the legally mandated disclosures to the public. While doing so, the defendant and others engaged in manipulative stock trading transactions and then orchestrated a promotional campaign for the purpose of facilitating the fraudulent dump of their shares into the market (a course of conduct commonly known as a pump-and-dump). *See generally id.* ¶¶ 8-18. Fortunately, the U.S. Securities & Exchange Commission ("SEC") suspended trading in Endeavor's securities before the scheme could result in significant financial harm to investors.[2]

For this misconduct, the defendant was charged with four offenses: (i) conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 1349 (Count One); (ii) securities fraud, in violation of 18 U.S.C. § 1348 (Count Two); and (iii) wire fraud, in violation of 18 U.S.C. § 1343 (Counts Three & Four). *Id.* ¶¶ 21-26. A coconspirator, Edward Withrow, was charged in the same indictment with the same charges, plus two additional counts of false statements, in violation of 18 U.S.C. § 1001 (Counts Five and Six). *Id.* ¶¶ 27-30. Withrow was Endeavor's Chairman and was alleged to have conspired with the defendant and others in the scheme. *Id.* ¶¶ 6, 8.

---

[2] *See* SEC Securities Exchange Act Release No. 69073, available at https://www.sec.gov/litigation/suspensions/2013/34-69073.pdf (last visited July 10, 2023).

The defendant resides in Vancouver, Canada (from where he is alleged to have committed his crimes), and he did not voluntarily appear in Massachusetts to answer the charges. Withrow, however, did reside in the United States, and after his arrest, Withrow proceeded to trial in December 2017.  The trial resulted in a hung jury and subsequent declaration of a mistrial.  (Dkts. #150, 151.)  Rather than proceed to a retrial, however, Withrow pleaded guilty to false statements in a superseding information and the government dismissed the counts against Withrow in the original indictment.  (Dkts. #191,192, 207.)  Withrow was sentenced to five years of probation, of which five months was to be served on home confinement, and a $10,000 fine.  (Dkt. #207.)   A second coconspirator—Sam Brown—pleaded guilty in a separate matter to an information charging him with conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 371, and false statements, in violation of 18 U.S.C. § 1001.  *See United States v. Brown*, 15cr10123-IT (Dkts. #13, 19).  After testifying at Withrow's trial as a government witness, Brown was sentenced to three years of probation, of which five months was to be served on home confinement, and was ordered to pay $22,237.41 in restitution.  *Id.* (Dkt. #40.)

The SEC filed a parallel civil suit in Massachusetts against the defendant within days of return of the indictment in this matter.  *See SEC v. Babini et al.*, 15cv13348-IT (Dkt. #1).  In November 2015, the defendant moved to stay the SEC's civil lawsuit pending resolution of the parallel criminal proceeding (*i.e.*, this case) so that the defendant would not have to decide whether to exercise or waive his Fifth Amendment rights in the civil action.  *Id.* (Dkt. #22 at 3). The Court in the civil matter granted the stay motion.  *Id.* (Dkt. #25).  Notwithstanding his success leveraging this criminal case to stay his parallel civil case, the defendant thereafter took no steps to answer the charges in this case; instead, he stayed in Canada, out of the U.S. government's immediate reach.

In 2018, following Withrow's guilty plea, the government sought the defendant's extradition from Canada. The defendant was arrested in Canada by Canadian authorities on or about April 21, 2020.[3] He was thereafter released on certain conditions, including the surrender of his passport and a curfew between 10:00 pm and 6:00 am. The defendant then vigorously contested his extradition at both the judicial and ministerial phases in Canada.[4] The judicial phase concluded almost a year later, in or about March 2021, when Canadian prosecutors secured an order of committal for extradition from a Canadian court. The matter then proceeded to the ministerial phase, during which the defendant continued to fight. While the government has limited visibility to the specific arguments the defendant offered to the Minister of Justice, the undersigned was contacted multiple times on behalf of the Canadian government to answer questions about, among other topics: (i) the purported delay between the alleged misconduct and the return of the indictment and the request for extradition; (ii) the status of the proceedings against the defendant's coconspirators; (iii) the U.S. sentencing process and the possible sentence the defendant might receive; (iv) whether the defendant's medical conditions will be a factor in whether he is granted pretrial release; and (v) whether the U.S. Marshals and Bureau of Prisons can meet the defendant's medical needs in custody and whether the medical care provided therein is adequate as a general matter to ensure the health of inmates. Ultimately, after another

---

[3] The government does not anticipate any dispute about the order of events and timeframe associated with the defendant's arrest and extradition proceedings. To the extent any dispute does arise, however, the government will be prepared to offer exhibits at the detention hearing.

[4] The three principal phases of extradition from Canada include the (i) authority to proceed stage, which involves a decision made by Canadian Department of Justice officials and results in a defendant's arrest; (ii) a judicial phase, which involves an extradition hearing before a judge of the superior court in Canada; and (iii) the ministerial phase, which involves a decision on surrender by the Minister of Justice. Following each of the second and third stages, a defendant has the right to appeal, first to the Court of Appeal and then ultimately the Canada Supreme Court. The Canadian government provides a summary of the process here: https://www.justice.gc.ca/eng/cj-jp/emla-eej/extradition.html (last visited July 10, 2023).

year had passed, in or about March 2022 Canada's Minister of Justice ordered that the defendant would be extradited.

The defendant, however, appealed the decisions from both the judicial and ministerial phases to a Canadian Court of Appeal. The hearing on those appeals was postponed several times over the course of 2022 and into 2023. Ultimately, in May 2023, just before the appeal hearing was about to take place, Babini advised Canadian prosecutors that he intended to abandon his appeals. On or about May 23, 2023 his appeals were dismissed and he was placed in custody for purposes of removal to the United States, with his surrender to take place no later than July 7, 2023. On that date, the U.S. Marshals took custody of the defendant and transported him to the District of Massachusetts, nearly eight years after the grand jury's indictment, nearly five years after the United States sought his extradition, and over three years after he was arrested in Canada.

**ARGUMENT**

    **I.**    <u>**Legal Framework**</u>

A defendant shall be detained pretrial if the Court finds that no condition or combination of conditions will reasonably assure the defendant's appearance. 18 U.S.C. § 3142(e)(1). To determine whether such detention is warranted, the Court shall consider: (i) the nature and circumstances of the offense; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including, among other matters, the defendant's ties to the community; and (iv) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)-(4).

When considering whether pretrial detention is warranted for a defendant who has been extradited to the United States, courts routinely consider whether the defendant had fought

extradition.  *See United States v. Amar*, 300 F. Supp. 3d 287, 292 (D.D.C. 2018) (identifying fact that the defendant "fought extradition in the past" as one of the reasons supporting pretrial detention); *United States v. Turino*, No. 09-CR-132, 2014 WL 5261292, at *2 (D. Nev. Oct. 15, 2014) (finding detention appropriate based in part on fact that the defendant "fought extradition to this country," which indicated that defendant was "not voluntarily facing criminal charges here"); *United States v. Magnifico*, No. 802CR129T23TBM, 2008 WL 276033, at *1-2 (M.D. Fla. Jan. 31, 2008) (agreeing with government that pretrial detention was warranted in part because the defendant had "vigorously contested extradition to the United States for four years" from Canada); *United States v. Gunn*, 00-cr-00048 (N.D. Fla.), Dkt. #1605 (Sept. 10, 2007) (Order of Detention Pending Trial) (ordering detention pending trial given the gravity of the charges and possible penalties where the defendant, a Canadian citizen, fought extradition "at every level, multiple times" for five years).

## II.     The Charges are Serious and the Weight of the Evidence is Substantial

First, the defendant faces four fraud charges that allege that he was a key participant in a sophisticated scheme to defraud U.S. investors in Endeavor, a publicly traded company.  The charges involve allegations that: (i) he secretly controlled a significant percentage of Endeavor's free-trading stock; (ii) he engaged in manipulative trading in Endeavor's stock, including by coordinating a fraudulent cross-trade with an undercover FBI agent; and (iii) he provided funds to pay for a promotional campaign intended to generate demand for Endeavor stock so that he could sell his secretly held shares at a profit.  These are serious charges that carry significant penalties: up to 25 years incarceration for the conspiracy and securities fraud charges, and up to 20 years incarceration for the wire fraud charges.

The weight of the evidence supporting the charges is also substantial. That evidence includes (i) the anticipated testimony of coconspirator Sam Brown, (ii) numerous recordings of calls with the defendant made by a cooperating witness, and (iii) corroborating brokerage and bank records. As he did at the trial against Withrow, Brown is expected to testify, among other things: that the defendant claimed he owned almost all of the free-trading shares in Endeavor in accounts in Switzerland; that he (Brown) was part of a conspiracy with the defendant and Withrow in which the defendant and Withrow agreed to split up the free-trading shares; and that the defendant planned to handle the sale of the free-trading shares for the group during a promotional campaign. Brown is further expected to testify that, in January 2013, the defendant wired him over $20,000 for the purpose of engaging a professional stock promoter to promote Endeavor's stock, which Brown then did.

In addition to Brown's testimony, the evidence at trial is expected to include numerous recordings of calls involving the defendant that were made by a cooperating witness who the defendant engaged to assist with the deal. During those calls, the defendant made numerous admissions, including, for example, that he's going to trade the Endeavor stock for the group and that he was accumulating the remaining free-trading Endeavor shares in the market at low prices by trying to "squeeze" and "pinch" a different Endeavor shareholder through manipulative trading designed to "stuff 'em down." During these same calls, the defendant also entered into an agreement with an undercover FBI agent to engage in a cross-trade designed to defraud retail investors with the goal of raising money to pay for the Endeavor promotional campaign. Specifically, the defendant agreed to sell Endeavor stock on the open market in a pre-arranged trade with the undercover agent, who claimed to have network of corrupt brokers who would be willing to purchase and hold Endeavor stock in their customers' accounts in exchange for

monetary kickbacks. The defendant agreed to engage in the fraudulent cross-trade and to pay the undercover agent "20 points" on the value of the transaction (which was contemplated to be $20,000). An excerpt of key portions of the call during which the illegal agreement was made is attached at Exhibit 1.

The evidence at trial is also expected to include corroborating brokerage records from Switzerland reflecting that Babini beneficially owned multiple nominee companies that held Endeavor stock, as well as bank records corroborating Brown's testimony that Babini paid him over $20,000 to line up the promotional campaign.

In sum, the weight of the evidence against the defendant strongly favors pretrial detention. The fact that the trial against the Withrow ended in a hung jury is of no moment in this regard, as the defendant and Withrow are differently situated. While Withrow was a company insider who strove to maintain an appearance of being at arms-length from the defendant and Brown, the defendant was intimately involved in all aspects of the planned pump-and-dump. To wit, in his closing argument at Withrow's trial, Withrow's attorney acknowledged that the evidence established the defendant's guilt: "It's also not in dispute that Brown and Babini were clearly engaged in illegal conduct. They clearly engaged in a scheme to try and manipulate the shares of Endeavor. They're talking about it as clear as day in the recordings with [the cooperating witness] ….". Trial Tr. Day 10 at 44.

Finally, the defendant faces a significant guidelines sentencing range ("GSR") should he be convicted at trial. By the government's calculation (reflected below), the defendant's GSR will be 70 to 87 months imprisonment. This fact similarly provides the defendant little incentive to remain in this District to face these charges.

| Guideline | Offense Level |
|---|---|
| § 2B1.1(a)(1) | 7 - Base Offense Level |
| § 2B1.1(b)(1)(I) | +16 - Intended loss > $1.5 Million |
| § 2B1.1(b)(10)(B) and (C) | +2 - Substantial part of the scheme committed from outside the United States and the offense involved sophisticated means |
| § 2B1.1(b)(2)(A)(ii) | +2 - Offense was committed through mass-marketing |
| Total: | **27 (70-87 Months Imprisonment)** |

### III. The Defendant has No Meaningful Ties to the United States

The defendant's history and characteristics also weigh in favor of pretrial detention. The defendant has no meaningful ties to the United States, and no ties whatsoever to this District. He has no employment here, no close family or friends here, and no established residence here.[5] The defendant would lose nothing (and gain everything) by leaving this District (and the United States) for Canada, where all his community ties are found. Accordingly, this factor weighs strongly in favor of detention. *Cf. United States v. Klyushin*, 21cr10104-PBS-MBB (Dkt. #34) (Jan. 24, 2022) ("Order of Detention Pending Trial") (ordering extradited defendant detained where, among other factors, the "defendant has absolutely no ties to the United States nor does he have any incentive to remain" and "[i]f convicted, he faces a lengthy period of incarceration in addition to significant financial consequences."); *see also United States v. Morrison*, No. 16-MR-118, 2016 WL 7421924, at *4 (W.D.N.Y. Dec. 23, 2016) (affirming detention order where "defendants lack ties not only to the Western District of New York but to the United States as a

---

[5] In his Motion for Pretrial Release, the defendant claims to have an uncle in New York City. Mot. for Pretrial Release at 5 (Dkt. #222). The government has no independent information to verify the defendant's relationship with this individual. More importantly, the defendant does not claim to have a close personal relationship with this uncle such that the relationship would provide an incentive for the defendant to stay in the United States rather than flee back to Canada. This stands in sharp contrast to the fact that the defendant's children and partner are all in Canada.

whole," where "they reside in Canada, and the property they own is in Canada," and where "the twenty-year maximum that the defendants face is … a motive for flight").

### IV.     The Defendant's Extradition Counsels in Favor of Pretrial Detention

The defendant did not come here voluntarily.  He contested extradition at every step, only withdrawing his appeals on the cusp of his appeal hearing when it was clear that his extradition fight would likely soon end in defeat.  What's more, despite fighting to avoid having to answer the charges in this case, the defendant affirmatively leveraged this case to also avoid having to answer the parallel civil charges against him.  While he has every right to contest extradition and to request relief in the civil case, his actions make clear that he has no intention of answering the charges in this case if given the opportunity to avoid doing so.  This fact similarly—and strongly—favors pretrial detention.

Anything other than pretrial detention will produce a high level of risk that the defendant will test the United States' and Canadian governments' commitment to re-extradite him.  If released, the defendant will have the opportunity to make a risk-reward assessment of whether to flee back to Canada and await the possibility of a second extradition.  Pursuing extradition from Canada is a very resource intensive endeavor, both for the United States' government and the Canadian government.  It is also a multi-year process, as the defendant's (first) extradition proves.  It would not be unreasonable for the defendant to conclude that another 3-5 years of freedom in Canada is worth the risk of re-extradition and potential additional punishment.  Moreover, the Department of Justice's Office of International Affairs has made clear to the undersigned that there is no guarantee that the Canadian government will agree to expend the same resources to re-extradite the defendant if he is released from pretrial detention and given the opportunity (albeit not sanctioned) to flee back to Canada.  The defendant—who has shown

that he has no intention of voluntarily answering the charges in the United States—could reasonably conclude that testing the Canadian government's commitment to re-extradite him is a path worth pursuing and a risk worth taking. He has no meaningful personal ties to lose if he flees and everything to gain. These circumstances strongly favor pretrial detention.

The fact that the defendant apparently was compliant with his bail conditions during the pendency of the extradition proceedings in Canada does not alter this conclusion. Unlike his lack of ties to this District, the defendant had (and has) substantial and meaningful personal ties to his community in Vancouver. Indeed, his attorney's letter at Exhibit A to the defendant's Motion for Pretrial Release characterizes him as having "very deep roots" in his community in Canada. That the defendant did not flee that community while he was safely avoiding the pending charges in the United States for eight years is unsurprising and immaterial.

Also immaterial is the fact that the undersigned and the defendant's counsel engaged in plea negotiations prior to the defendant's abandonment of his extradition appeals. When the defendant's efforts to fight extradition were nearing their conclusion without success and it became clear that his extradition was likely, the defendant changed tack and requested that the U.S. Attorney's Office dismiss his criminal charges in favor of a civil resolution of the SEC's (stayed) action. When that request was rebuffed, the defendant and the undersigned then engaged in plea negotiations that contemplated a guilty plea. Ultimately, however, no plea agreement was reached due to the defendant's failure to commit to accept responsibility for the full scope of his alleged misconduct. In these circumstances, the failure of the parties' plea negotiations actually supports the government's request for pretrial detention rather than undermines it.

## CONCLUSION

For the foregoing reasons, the government submits that the defendant poses a serious risk of flight and that no combination of conditions will reasonably assure the defendant's appearance at trial. Pursuant to factors set forth in 18 U.S.C. § 3142(e)(1), the defendant should be detained pending trial.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:   */s/ James R. Drabick*
James R. Drabick
Assistant United States Attorney
(617) 748-3498

Date: July 11, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

        By:    */s/ James R. Drabick*
                  James R. Drabick
                  Assistant United States Attorney
                  (617) 748-3498

Date: July 11, 2023